# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARTHA L. KEEL,**

                    **Plaintiff,**

**-vs-**                                        **Case No.  6:05-cv-141-Orl-31JGG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

                    **Defendant.**

---

## MEMORANDUM OF DECISION

Plaintiff Martha Keel ["Keel"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED**.

## I.    PROCEDURAL HISTORY

On April 26, 2002, Keel filed a claim for disability insurance benefits, claiming disability as of June 29, 2001 due to a variety of ailments, including back injury, back pain, pain and numbness in her legs and feet, pressure on her sciatic nerve, diabetes, and depression.  R. 46, 56, 86.  On July 12, 2004, the Honorable Peter M. Davenport, Administrative Law Judge ["ALJ"], held a seventeen-minute hearing on Keel's claim in Orlando, Florida.  R. 265-79.  Bernice Ippolito, a non-attorney, represented Keel at the hearing.  R. 265.  The ALJ heard testimony from Keel and Donna Mancini, an impartial vocational expert.  R. 266.

On July 26, 2004, the ALJ issued a decision that Keel was not disabled and not entitled to benefits. R. 20-21. Following a review of the medical and other record evidence, the ALJ found that Keel retained the residual functional capacity ["RFC"] to perform the physical exertional requirements of light work. R. 21, Finding 6. The ALJ found that Keel could lift and carry twenty pounds, and could stoop, crouch, and climb ramps and stairs occasionally. *Id.* The ALJ found that Keel could perform her past relevant work as a solderer and assembler, as those jobs did not require the performance of work-related activities precluded by Keel's RFC. *Id.*, Findings 7, 8. As Keel's medically determinable impairments did not prevent her from performing her past relevant work, the ALJ found that Keel was not disabled.[1] *Id.*, Findings 8, 9.

After considering additional medical records, R. 7A, 10, the Appeals Council denied review. R. 10. On January 26, 2005, Keel timely appealed the Appeals Council's decision to the United States District Court. Docket No. 1. On September 8, 2005, Keel filed in this Court a memorandum of law in support of her appeal. Docket No. 19. On November 7, 2005, the Commissioner filed a memorandum in support of her decision that Keel was not disabled. Docket No. 20. In a supplemental administrative action, the Commissioner found Keel disabled as of July 27, 2004, narrowing the period under consideration to the period from June 29, 2001 to July 26, 2004. Docket No. 24. The appeal is ripe for determination.

---

[1]The Social Security ALJs face a herculean task. The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals. With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases. The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

## II.   THE PARTIES' POSITIONS

Keel assigns two errors to the Commissioner.  First, Keel claims that the Commissioner erred in finding that Keel could perform the full range of light work.  Docket No. 19 at 11.  Second, Keel claims that the Commissioner erred by improperly concluding that Keel's mental impairments did not impose any functional limitations of Keel's ability to work.  *Id.* at 13.

The Commissioner argues that substantial evidence supports her decision to deny disability.  First, the Commissioner responds to Keel's second argument by arguing that substantial evidence supports the Commissioner's finding that Keel's mental impairments were not severe.  Docket No. 20 at 3.  Second, the Commissioner counters (in response to Keel's first issue) that substantial evidence supports the Commissioner's finding that Keel could perform the full range of light work. *Id.* at 11.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate

-4-

award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

### D.   STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Keel submitted additional medical records covering from July 9, 2004 through August 12, 2004.[3] R. 7, 10-11, 258-64. If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application."   20 C.F.R. § 404.976(b)(1)(2005).   The Appeals Council did not return the additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 7A, 10.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g)).   The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if

---

[3]Keel also re-submitted a medical source statement dated June 9, 2003 that was already in the record and a letter from her representative dated August 30, 2004, but no new evidence before July 9, 2004 and after August 12, 2004.  R. 258-59.

the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*,

-8-

983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket No. 1 at 2, ¶¶ 6-7.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently

of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review. The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review." *See Sims*, 120 S.Ct. at 2086; *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.   <u>THE LAW</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the

-10-

claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

**A.      DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

**B.      THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does

not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the

claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the

national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th

Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's

impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing

court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.     PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### F.     CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon*

*v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352

(11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d

at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit

finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.      MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine whether

the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th

Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a

consultative examination unless the record establishes that such an examination is necessary to enable

the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988);

-18-

*Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to

resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not

adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

## V.   APPLICATION AND ANALYSIS

### A.   THE FACTS

Keel, was born on December 12, 1947.  R. 45.  She was fifty-six years old on July 12,

2004, the day of the hearing.  R. 265.  Keel completed high school, some community college, and

some vocational training as a solderer.  R. 62.  She has worked as a patient care technician (R. 57,

77-84) and has past relevant work in electronics as a solderer and as an assembler.  *Id.*; R. 21,

Finding 7.

Keel reports being injured initially on March 11, 2001 while working as a patient care

technician at Florida Hospital in Altamonte Springs, Florida.  R. 130, 200.  Keel was taking care of

a patient when she twisted her back.  R. 200.  Since the injury, Keel had various complaints of

pain.  Keel sought treatment from Dr. Vincent Mamone a number of times between March1999

and April 2001.  R. 151-59.  On April 12, 1999, Keel reported feeling tired for two months prior to

the visit.  R. 159.  Dr. Mamone assessed fatigue and obesity.[4]  *Id.*

Keel had similar complaints of fatigue in June 1999.  R. 159.  Dr. Mamone diagnosed high

blood pressure, and again, Type 2 Diabetes Mellitus and obesity.  *Id.*  Keel complained of lower

back pain on August 10, 1999.  Dr. Mamone assessed Sciatica, DJD (degenerative joint disease),

Type 2 Diabetes Mellitus, a high ESR (erythrocyte sedimentation rate), and high cholesterol.  R.

157.  He recommended Ibuprofen, Skelaxin, and application of moist heat to the back.  *Id.*  Keel

returned on November 15, 1999 with complaints of leg cramps.  R. 156.  Dr. Mamone diagnosed

Type 2 Diabetes Mellitus, fibromyalgia (chronic muscle pain syndrome), obesity, and OSA (a

---

[4]Dr. Mamone's notes are mainly illegible.  R. 151-59.  In most of his notes, he also included diagnoses or
recommendations that are illegible.  *Id.*

sleeping disorder).  *Id.*  On June 1, 2001, Dr. Mamone noted that Keel's sciatic nerve was "still

very painful," and that she was unable to work because of the pain.  R. 151.  At that time, Keel

was taking Vicodin, Flexiril, Dexamethasone, Medrol Dosepak, Vioxx, and Ibuprofen.  *Id.*

On August 15, 2001, Keel sought treatment with Dr. Donald L. Behrmann.  R. 130-31.

Keel complained of right buttock and right lower extremity pain.  R. 130.  She denied any

symptoms of pain in her left lower extremity, but reported a history of lower back pain that

"responded reasonably well" to physical therapy.  *Id.*  Dr. Behrmann's impression was L5-S1 HNP

(herniation) with multi-level lower lumbar stenosis.  R. 131.  His physical examination revealed

that Keel was able to stand and ambulate reasonably well.  R. 130.  He noted that her range of

motion was relatively good for her size, but that she had  pain with extension.  *Id.*  A straight leg

raise aggravated her right buttock pain at sixty to ninety degrees on the right side.  *Id.*  Her strength

testing was normal.  She had lost sensation with L5 and S1 distributions on the right foot and

ankle, and her deep tendon reflexes were diminished .  R. 130-31.

An MRI scan of Keel's lumbar spine showed mild disk degenerative changes in the lower

three segments with moderate or severe focal stenosis at each segment.  R. 131.  The MRI also

showed right paracentral disk herniation at L5-S1 which produced "severe compromise" at that

region.  *Id.*  Dr. Behrmann recommended surgery – decompressive laminectomy at L3-5 with

diskectomy at L5-S1, and Keel agreed.  *Id.*  The doctor also recommended that Keel not return to

work until after her surgery.  His notes also state:

> I do not think she could ever return back to her original employment as a patient
> care tech requiring her bending and lifting excessive amounts (sic).  It is my
> opinion that her lumbar stenosis is a preexisting condition with an overlying acute

disk herniation related to her work injury in May of this year, requiring or
necessitating the need for surgery.

*Id.*

Keel underwent a lumbar L3-L5 laminectomy and a right L5-S1 diskectomy in September

of 2001.  R. 129.  Keel saw Dr. Behrmann for a follow-up visit on September 19, 2001,

approximately two weeks after her surgery.  *Id*.  Keel reported that she was "fairly well," but also

complained of significant pain and numbness in her right leg.  *Id.*  Dr. Behrmann informed Keel

that her symptoms were normal considering her surgery, and that the symptoms would subside,

except that she may have some permanent residual numbness.  *Id.*  Dr. Behrmann's examination

revealed that Keel's incision was healing without problems.  *Id.*  He refilled her prescription for

Soma and switched her from Percocet to Vicodin.  *Id.*  He also noted that Keel was receiving home

physical therapy, which he suggested she continue for two weeks, followed by outpatient therapy.

*Id.*

Keel went to the emergency room at Florida Hospital Medical Center on October 3, 2001

with complaints of "intractable pain."  R. 100-01.  Keel was initially examined by Dr. John A.

Jenkins, whose impression was that Keel had "recurrent pain" status "post lumbar laminectomy."

R. 105.  Dr. Jenkins started Keel on intravenous pain control.  *Id.*  His physical examination

showed grossly normal strength in her upper and lower extremities, diminished reflexes in the

lower extremities, and pain with movement in both legs.  R. 104.  He noted that she had normal

attention and concentration span and memory.  *Id.*  Dr. Jenkins referred Keel back to the care Dr.

Behrmann.  *Id.*  An MRI of Keel's lumbar spine taken at the hospital did not show any post-

operative changes and no evidence of recurrent herniation.  R. 101.  A CT scan revealed

"questionable" small L5-S1 recurrent disc herniation.  *Id.*  Dr. Alan R. Wladis saw Keel at the

hospital to perform a Bilateral Lower Extremity Venous Duplex Study.  R. 106.  He found no

evidence of deep or superficial venous thrombosis of Keel's bilateral lower extremities.  *Id.*  A

myelogram dated October 8, 2001 showed possible right L5-S1 disc herniation.  R. 113.  Another

CT scan of her lumbar spine showed L5-S1 disc herniation.  R. 114.

Dr. Behrmann's notes indicate that Keel was discharged from the hospital on October 10,

2001 (R. 100) and was transferred to Sunbelt Orlando for pain therapy and treatment on October

16, 2001 (R. 101).  Dr. Berhmann's discharge diagnoses was recurrent right L5-S1 herniated

nucleus pulposus, diabetes, and depression.  R. 100.  He also described her as "morbidly obese."

*Id.*  While Keel was at the hospital she received PCA pump treatment, and Dr. Behrmann noted

that she did not show improvement "despite aggressive conservative measures."  R. 101.

On October 11, 2001, Keel received epidural steroidal injections.  R. 122.  Dr. Douglas A.

Conigliaro performed the procedure, and wrote in his report that he was not "100% certain as to the

efficacy of today's block . . ."  R. 123.  He expressed doubt as to whether the "majority of her pain

symptoms are from S1 radiculopathy."  *Id.*  The next day, on October 12, 2001, Keel underwent a

microdiskectomy procedure for her recurrent disc herniation at L5-S1.  R. 120.  A radiology report

dated October 14, 2001 showed that Keel he no enthesopathy and no fracture or dislocation in her

hip and pelvis.  R. 119.

On November 26, 2001, Keel returned to Dr. Behrmann and continued to complain of back

and right lower extremity pain.  R. 127.  Keel reported that overall, she improved, and had "some

good days with her bad days."  *Id.*  Dr. Behrmann recommended that Keel go to a swimming pool

and do walking and aquatic therapy.  *Id.*  He also renewed her prescriptions for OxyContin,

Ibuprofen, and Neurontin.  *Id.*  He noted that Keel remained on Paxil pursuant to her psychiatric

care.  *Id.*

On December 14, 2001, Keel saw Dr. Mamone with complaints of swollen ankles.  R. 150.

Keel had stopped taking her medication because it made her dizzy.  *Id.*  Dr. Mamone assessed Type

2 DM (Diabetes Mellitus), lumbar and neck pain, a sleeping disorder, constipation (as a result of

her pain medication), and Depression.  *Id.*  An MRI scan of Keel's lumbar spine dated January 21,

2002 revealed disc dehydration and minimal diffuse disc bulging at L3-4 and L4-5 (which was

where Keel previously underwent the decompression procedure) and abnormalities at L5-S1.  R.

167.  The MRI report indicates that the abnormal signal at L5-S1 was a post-operative change. *Id.*

Keel saw Dr. Behrmann on January 30, 2002 and showed "just some gradual

improvement," according to Dr. Behrmann's notes.  R. 125.  Keel continued to complain of back

pain with radicular symptoms and right leg and foot numbness.  *Id.*  Keel reported being able to

"wean down" to taking only one Oxycontin pill per day.  *Id.*  Dr. Behrmann recommended that

Keel "wean off" the medication entirely and take Percocet only for "breakthrough" pain.  *Id.*  The

doctor noted that Keel walked without using a walker, and further recommended that Keel continue

to be "followed up conservatively."  *Id.*  Dr. Behrmann, however, thought that Keel would not do

well with physical therapy treatment.  *Id.*

On March 7, 2002, Keel saw Dr. Joy Abraham, a psychiatrist and neurologist, for a

Worker's Compensation Psychiatric Evaluation.  R. 199-202. Dr. Abraham diagnosed Adjustment

Disorder with Depression that was "[r]esolved."  R. 201.  According to Dr. Abraham, Keel

"clearly" had depression that was caused by Keel's March 11, 2001 work injury, but according to Dr. Abraham, Keel did not display any symptoms of depression during the evaluation. *Id.* Keel reported improvement in her pain, but still complained of pain in her right buttock and lower right extremity. R. 200. Dr Abraham noted that Keel's speech was logical and coherent and her memory , attention, and concentration were good. R. 201. Keel was also oriented to time, place, and person. *Id.* Dr. Abraham characterized Keel as "of average intelligence." *Id.* Dr. Abraham expressed an intention to re-evaluate Keel at a later date "to determine whether the remission is sustained without antidepressant medications." *Id.*

According to notes from a follow-up appointment with Dr. Behrmann on April 3, 2002, Keel continued experiencing "chronic back pain, particularly into the right buttock and sacroiliac region with some paresthesias to both lower extremities," despite doing "reasonably well on a regimen of taking Neurontin, Ibuprofen, and an occasional Percocet. R. 124. At that time, Dr. Behrmann felt Keel had reached maximum medical improvement "from a neurosurgical standpoint." He also stated that he would place "permanent sedentary work restrictions on [Keel] of no lifting greater than 10 to 20 pounds, very limited bending, turning, twisting, stooping and no sitting, standing or walking for longer than 60 minutes without interruption or break." *Id.* Dr. Behrmann also added "I do not believe she can return back to work lifting and dealing with patients as her previous job occupation requires." *Id.*

Dr. Abraham's notes indicate that he saw Keel on April 15, 2002 for her "re-evaluation." R. 198. Keel reported feeling "very" depressed, hopeless, and helpless. *Id.* She was also having trouble sleeping. *Id.* Dr. Abraham states that Keel had a "relapse of depression which is [causally]

related to" Keel's injury from May 1, 2001.  *Id.*  Dr. Abraham prescribed Celexa for depression.

*Id.*  On April 26, 2002, Keel filed her claim for disability insurance benefits.  R. 46.

On May 7, 2002, Keel saw Dr. Kayvan Ariani who diagnosed: low back and right lower

extremity pain (with a history of lumbar spinal stenosis), a history of diabetes mellitus,

hypertension, and a history of thyroid disfunction.  R. 144-45.  Keel complained of pain and

numbness in her lower back with radiation to her right foot.  R. 144.  She reported that her pain

increased with bending and lifting, but improved with lying down and taking pain medication.  *Id.*

Dr. Ariani stated that Keel had not done well with lumbar epidural steroid injections, and

recommended that she: continue taking Percocet and Ibuprofen, taken an increased dosage of

Neurontin for three weeks, and consider transforaminal epidural steroid injections and aquatic

therapy.  R. 145.  Dr. Ariani observed that Keel's gait was antalgic and that she had pain in her

right sciatic notch.  R. 144.  Her lumbar  range of motion was limited to forty-five degrees flexion,

ten degrees extension, and ten degrees lateral flexion bilaterally.  *Id.*  An examination of her motor

system revelaed that she had normal extremity strength and symmetrical reflexes, except some

decreased reflex in the right patella.  *Id*.

Keel saw Dr. Abraham again on May 14, 2002 with similar complaints of sleeplessness,

and feeling depressed and helpless.  R. 198.  She reported having no side effects from taking

Celexa.  *Id*.  Dr. Abraham continued her prescription and recommended that she follow-up with

him in one month.  *Id*  On May 28, 2002, Keel also returned to Dr. Ariani and reported

improvement in her pain as a result of her increased dosage of Neurontin.  R. 137.  Dr. Ariani,

again, diagnosed low back and right lower extremity pain (with a history of lumbar spinal stenosis),

a history of diabetes mellitus, hypertension, and a history of thyroid disfunction.  *Id.*  He recommended that she continue taking Neurontin and take Bextra (or Ibuprofen if Bextra had adverse side effects).  *Id.*  He continued to recommend that Keel consider transforaminal epidural steroid injections and aquatic therapy.  R. 138.

From June 2002 through September 2002, Keel sought therapy with Dr. Abraham.  R. 195-198.  During these sessions, Keel reported severe pain, trouble sleeping, an inability to relax, and depression.  *Id.*  Dr. Abraham noted at various times that Keel was depressed or that her mood was "intermittently" depressed.  R. 196.  The doctor prescribed Celexa, and encouraged Keel to increase her activity level.  *Id.*  On July 7, 2002, Dr. Abraham noted that Keel was depressed, but was also alert and oriented to time, place, and person.  *Id.*

Keel saw Dr. Mamone on June 17, 2002, and told him that she felt drowsy in during the day and was unable to sit for short periods of time.  R. 149.  Dr. Mamone assessed Diabetes, Type 2, chronic back pain, and high cholesterol.  *Id.*

In a Work History Report, dated July 10, 2002, Keel described her former employment as a solderer and assembler of P.C. boards.  R. 80, 84.  For the job, she frequently lifted less than ten pounds, with twenty pounds being the heaviest she had to lift.  R. 80.  In an eight-hour workday, she was required to sit for six to seven hours; walk and stand for a half hour to one hour; handle or grasp large objects for one hour; reach for half an hour; and write, type, or handle small objects for seven to eight hours.  *Id.*  She used machines, tools, and equipment, and the job required technical knowledge and writing reports.  *Id.*  She was never required to bend, kneel, crouch, or crawl.  *Id.* Keel also described other solderer jobs with similar requirements with slight variation.  R. 81-83.

-30-

Her job as a solderer of frames for telephone communications required two to three hours of standing and some climbing, stooping, kneeling, and crouching.  R. 82.  In that job, the heaviest Keel lifted was twenty-five pounds; she lifted ten to twenty-five pounds frequently.  *Id.*

On July 10, 2002, a state agency psychologist opined that Keel's Adjustment Disorder and Depression was not severe.  R. 169, 172.  Keel had "mild" limitations: in restrictions on her activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace.  R. 179.  She also had no episodes of decompensation.  *Id.*  The psychologist's notes state that Keel's level of depression may be related to her level of pain.  R. 181.

At the request of the Office of Disability Determinations, Dr. Sam Ranganathan completed a consultative physical examination on August 7, 2002.  R. 183-186.  Keel reported tingling and numbness in her feet, crying spells, and stated that she "does not feel like doing much."  R. 184.  Dr. Ranganathan diagnosed: "Status Post LS spine Surgery X 2"; a history of hypertension; Diabetes Mellitus, Type 2; and "Depression, Transient."  R. 185.  Dr. Ranganathan opined:

> The patient is able to stand and/or walk 2 hours per day.  Able to sit for 6 hours.
> Able to lift and carry 10 pounds occasionally and frequently.  There are no
> manipulative limitations.  Frequent environmental workplace limitations like
> heights and driving in view of her LS spine condition.  She also has frequent
> postural limitations in view of her LS spine condition as mentioned above.

*Id.*  Dr. Ranganathan's examination revealed decreased sensation to touch in the lateral aspect of the left thigh, right leg, and right foot.  R. 184.  Strength tests of her motor system were 5/5, except for 4/5 at the right lower extremity.  *Id.*  She was unable to walk tandem and heel-to-toe.  *Id.*  Dr. Rangathan noted that he observed her sitting comfortably for ten to fifteen minutes on the

-31-

examination table and in the waiting room.  *Id.*  She exhibited antalgic gait, and positive straight

leg raising on the right at 70 degrees.  R. 184-85.  Keel was able to take off her own jeans, shoes,

and socks, and mount and dismount the examination table by herself slowly.  R. 185.  Dr.

Ranganathan noted that Keel was alert and awake, and that her thought processes and in-depth

thinking were "good."  *Id.*

A state agency physician completed a physical functional capacity assessment on August

16, 2002.  R. 187, 194.  The physician opined that Keel could lift and carry twenty pounds

occasionally and ten pounds frequently; stand, walk, and sit approximately six hours in an eight-

hour workday; and push and pull without limitation.  R. 188.  The physician also opined that Keel

had occasional postural limitations inher abilities to climb, balance, stoop, and crouch.  R. 189.

Keel had no manipulative, visual, communicative, or environmental limitations.  R. 190-91

On November 13, 2002, another state agency psychologist completed a mental RFC

assessment of Keel.  R. 204-21.  The psychologist opined that Keel had an Affective Disorder that

required an RFC Assessment.  R. 208.  The psychologist also concluded that Keel had "mild"

restriction of activities of daily living, "mild" difficulties in maintaining social functioning, and

"moderate" difficulties in maintaining concentration, persistence, or pace.  R. 218.  Keel had no

repeated episodes of decompensation.  *Id.*  The psychologist also opined that Keel was moderately

limited in her ability to maintain attention and concentration for extended periods of time, and

moderately limited in her ability to "complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods."  R. 205.

Keel returned to Dr. Ariani on October 8, 2002, and reported that she "sometimes misses her dose of Neurontin" in the daytime because "she is going to bed really late at night and sleeps most of the day."  R. 102.  She also reported intermittent bladder incontinence.  *Id.*  Dr. Ariani ordered an MRI of her lumbosacral spine, recommended that Keel increase her level of aerobic activity and continue taking Neurontin and Ibuprofen, and referred her to Dr. Behrmann for another evaluation.  *Id.*  Dr. Ariani's impression was still low back and right lower extremity pain, a history of diabetes mellitus, hypertension, and a history of thyroid disfunction.  *Id.*

On January 11, 2003, another state agency physician opined as to Keel's physical RFC.  R. 222, 229.  The physician's opinion was the same as that of the state agency physician's from 2002. Keel could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and sit approximately six hours in an eight-hour workday; and push and pull without limitation.  R. 223.  Keel could occasionally climb, stoop, and crouch.  R. 224.  Keel had no manipulative, visual, communicative, or environmental limitations.  R. 225-26.  The physician noted that there was no evidence of muscle atrophy and that Keel walked without an assistive device.  R. 227.

On April 20, 2003, Keel went to the emergency room at Florida Hospital with chest pain. R. 232.  She reported having shortness of breath and chest pain beginning the evening before.  *Id.* The doctor's impression was chest pain or subendocardial myocardial infarction, obesity, a history of multiple surgeries, hypercholesterolemia, and borderline hypertension.  R. 233-34.  The hospital treated her with aspirin, nitroglycerin, beta blocker, Integrilin, and Lovenox, and ordered a cardiac evaluation.  R. 234.  Keel's cardiogram on April 21, 2003 showed indications of acute coronary syndrome.  R. 246.  Keel saw Dr. Cheryl Billips on the same day as a consultation for Keel's acute

coronary syndrome.  R. 243.  Dr. Billips assessed subendocardial myocardial infarction,

hypertension, diabetes, hyperlipidemia, and obesity.  R. 244.  Dr. Billips recommended that Keel

undergo cardiac catheterization for a definitive coronary artery assessment.  *Id.*  The doctor also

recommended that Keel continue with her current medical therapy and take aspirin, Atenolol,

Aggrastate, and Lovenox.  *Id.*

　　　The following day, Dr. Nandkishore Ranadive performed left heart catheterization,

coronary angiography, and left ventriculography.  R. 241.  Dr. Ranadive discovered high-grade

stenosis in Keel's circumflex coronary artery (ninety-nine percent mid-stenosis) and thirty-percent

mid-stenosis in the left anterior descending artery.  R. 242.  The doctor recommended an

angioplasty (PTCA) and stenting.  *Id.*  On April 23, 2003, Keel underwent selective coronary

angiography, PTCA for her stenosis, and stenting for relief of angina.  R 239.  Dr. Ranadive's notes

indicate that the procedure was successful.  R. 240.  He recommended that Keel take aspirin and

Plavix for at least three months and receive "aggressive medical therapy with risk factor

modification."  *Id.*  Dr. David Rzepczynski evaluated Keel on April 24, 2003 as a result of a drop

in her hemoglobin on April 20, 2003.  R. 236.  Dr. Rzepczynski diagnosed acute anemia,

subendocardial myocardial infarction, and noted that Keel had a history of colon cancer in her

family.  R. 237.  An arterial imaging study performed the say day revealed a "questionable small

false aneurysm" off of Keel's common femoral artery.  R. 238.  Keel was referred elsewhere for

further treatment.  *Id.*

　　　On May 21, 2003, Dr. Ranadive wrote a letter "To Whom It May Concern," stating that

Keel was a patient of his with a long-standing history of diabetes mellitus and hypertension.  R.

-34-

256.  He also stated, "Due to her multiple medical problems including coronary artery disease, diabetes mellitus, hypertension and degenerative joint disease, in my opinion, she is presently disabled." *Id.*

In another letter addressed "To Whom It May Concern," Dr. Mamone noted that Keel had been a patient of his since August 1995, and that she had chronic back pain that was not helped by "failed spinal surgery." R. 248.  In the letter, dated June 9, 2003, Dr. Mamone also opined that Keel was "unable to lift greater than 10 pounds and is unable to stay in one position for even short periods of time."  He explained that Type 2 Diabetes Mellitus complicated her back pain, and that Keel had recently suffered a heart attack which required angioplasty and stenting. *Id.*  He concluded by stating  "She certainly should be considered for disability." *Id.*

On January 28, 2004, Keel again went to the emergency room at Florida Hospital for another cardiac catheterization to evaluate her heart and arteries. R. 249.  The admitting physician, Dr. Ranadive, noted that she was not in acute distress, but assessed atherosclerotic heart disease with stable angina pectoris. R. 249-50.  The catheterization revealed a normal left main coronary artery and moderate diffuse disease of the left anterior descending artery with "a critical 30% in the proximal to mid part of the vessel." R. 251-52.

On June 18, 2004, Keel's chiropractor, Daniel S. Yachter, wrote a letter (addressed "To Whom It May Concern") stating that Keel received a spinal injury after her fall and had a "great deal of pain" as a result of the injury. R. 257.  He also stated that she had Lumbalgia, lumbar and cervical subluxation, and muscle spasms. *Id.*

-35-

In a letter dated July 9, 2004 and addressed "To Whom It May Concern," Dr. Mamone states that Keel's "type II diabetes is not well controlled presently" and that Keel "is now being treated for major depression with antidepressant medication."  R. 261.  He also notes that Keel's medications should be adjusted "for better control" of Keel's medical problems.  *Id.*

Keel testified at the seventeen-minute hearing on July 12, 2004.  R. 265-79.  Keel described her most recent job as a "patient care tech" at a hospital, and testified that prior to that job, she worked as a solderer in an electronics plant, doing "rework and modification on PC boards."   R. 269-70.  Keel testified that most of the soldering was done in the seated position, and the most she lifted was ten to twenty pounds.  R. 270.  Keel testified that she has difficulty sitting, standing, and walking for long periods of time.  R. 273.  She stated that she cannot wash dishes because she cannot stand long enough to complete the activity.  *Id.*  Keel also stated that she could not perform any tasks (such as dusting) with her arms over her head because of her back pain, and reported sitting down to bathe.  R. 276.  Keel also reported feeling "very" depressed.  *Id.*   The VE then testified about Keel's former work.  R. 277-78.  He characterized  Keel's jobs as an assembler and in "solder production" were light, unskilled work; her job as a quality control assembler and supervisor was medium, skilled work; and her job as a nurse's assistant was medium to light, semi-skilled work.[5]  *Id.*  On July 26, 2004, the ALJ issued a decision that Keel was not disabled and not entitled to benefits.  R. 20-21.  In a supplemental administrative action, the Commissioner found Keel disabled as of July 27, 2004.  Docket No. 24.

---

[5]According to the ALJ, the VE "offered testimony indicating that give [Keel's] particular residual functional capacity, [Keel] can return to the type of work she performed in the past."  R. 20.  This is incorrect.  The VE only offered testimony on how to classify Keel's former jobs.  R. 272, 277-78.

A prescription from Dr. Mamone indicates that as of August 10, 2004, Keel was prescribed: Amaryl, Effexor, Neurontin, Ibuprofen, Atenolol, Isosorbide, and Lipitor.  R. 262.  On August 20, 2004, Dr. Mamone opined as to Keel's functional capacities on a form faxed to him from Keel's representative.  R. 263-64.  According to Dr. Mamone, Keel could not lift or carry more than eight pounds for up to one-third of a workday; stand or walk less than two hours; and sit less than two hours.  R. 263.   Keel was limited in her ability to push and pull with her hands and feet.  *Id.*  Keel had limited range of motion, but no decreased grip strength.  *Id.*   Finally, Dr. Mamone opined that Keel would not be able to sustain gainful employment "as an assembler, sitting and reaching or as a solderer or as a Quality Assurance person in a factory environment for 6 to 8 hours a day."  *Id.*

**B.     THE ANALYSIS**

Keel contends the ALJ erred: 1.) because substantial evidence does not support the conclusion that Keel  could perform the full range of light work (Docket No. 19 at 11), and 2.)  because the ALJ incorrectly found that Keel's mental impairments did not impose any functional limitations of Keel's ability to work (*id.* at 13).

1.     Keel's Ability to Perform Light Work

In arguing that substantial evidence does not support the finding that Keel can perform light work, Keel complains of two specific errors: 1.) the ALJ relied heavily on only a portion of Dr. Berhmann's opinions and findings without considering all of Dr. Behrmann's findings; and 2.) the ALJ did not address the opinions of Dr. Mamone and Ranadive who both opined that Keel cannot work.  *Id.* at 11.  The Commissioner counters that substantial evidence supports the finding that Keel could perform the full range of light work, and more

-37-

specifically, argues that as the medical source opinions Keel mentions were opinions on issues reserved for the Commissioner, the ALJ was not required to give them any "special significance." Docket No. 20 at 11. Keel is correct as to both points.

Following a brief review of Keel's medical and other record evidence, the ALJ found that Keel retained the capacity to perform light work activity. R. 20, 21, Finding 6. The ALJ adopted the limitations expressed by the state agency physician (in the physical RFC assessment dated January 11, 2003), and stated that the finding was "generally consistent with the findings of Dr. Behrmann, treating physician, that claimant can lift and carry no more than 20 pounds." R. 20. The ALJ, in making the specific finding that Keel retained the RFC for light work, states, again, that "[e]vidence supports a finding that [Keel] can lift and carry 20 pounds" and that "[s]he is restricted to no more than occasional stooping, crouching, and climbing of ramps and stairs." R. 21, Finding 6.

Keel correctly notes that the ALJ focused on Dr. Behrmann's opinion that Keel could lift and carry twenty pounds and largely ignored Dr. Behrmann's other opinions. Docket No. 19 at 12. While the ALJ briefly mentions other medical evidence and Keel's daily activities in the rest of his decision (R. 19), in explaining his finding on Keel's RFC, the ALJ only notes the opinions of Dr. Behrmann and the state agency physician (as stated above). The ALJ states three times that Dr. Behrmann reported that Keel could lift and carry up to twenty pounds. R. 17, 18, 20. The ALJ never mentions Dr. Behrmann's entire opinion that Keel had "permanent" work restrictions that involved "no lifting greater than 10 to 20 pounds, very limited bending, turning, twisting, stooping, and no sitting, standing, or walking for longer

than 60 minutes without interruption or break." R. 124. These limitations are not consistent

with the requirements of light work activity.[6] While the ALJ did state that his finding was

"generally consistent" with Dr. Behrmann's opinion, the ALJ never explained why he

rejected or ignored portions of Dr. Behrmann's opinions. The ALJ's reliance on only a

portion of Dr. Behrmann's findings and opinions do not support finding that Keel could

perform the full range of light work.

Keel also specifically complains that the ALJ erred in providing no explanation for

the rejection of the opinions of Dr. Mamone and Dr. Ranadive, both treating physicians. Dr.

Mamone, Keel's treating physician, opined that as a result of Keel's chronic back pain (which

he noted was complicated by Type 2 Diabetes Mellitus), Keel was "unable to lift greater than

10 pounds and is unable to stay in one position for even short periods of time." R. 248. Dr.

Ranadive's letter dated May 21, 2003 states "Due to her multiple medical problems including

coronary artery disease, diabetes mellitus, hypertension and degenerative joint disease, in my

opinion, [Keel] is presently disabled." R. 256. As stated earlier, absent the existence of

"good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis,

and medical evidence of a treating physician.

---

[6]The Code of Federal Regulations provide, in pertinent part, that:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. 404.1567(b) (emphasis added).

The Commissioner responds that, as the opinions were on issues reserved for the Commissioner, the opinions were not entitled to controlling weight.  While the Commissioner is correct that the ALJ is not required to give special significance to the status of a physician as treating or non-treating to opinions on certain issues reserved for the Commissioner (e.g., whether the claimant meets a listed impairment, a claimant's residual functional capacity , or whether a claimant meets the statutory definition of disability),  the ALJ must still consider and weigh the medical opinions (even assuming a treating physician's opinion does not warrant controlling weight).[7]  In this case, aside from adopting the state agency physician's opinions, the ALJ never stated with particularity the weight he gave to *any* of the various medical opinions (including those of three treating physicians Dr. Behrmann, Dr. Mamone, and Dr. Ranadive).[8]

In addition, the Commissioner argues that substantial evidence supports the ALJ's finding because the ALJ based his finding that Keel could perform light work on the "totality of the record."  Docket No. 20 at 13.  However, the ALJ's failure to state with particularity the weight assigned to any medical opinions in the record make it impossible for this reviewing court to determine whether the finding was based on substantial evidence.  Also, the record does indicate very serious diagnoses by a number of physicians, and some serious

---

[7] Social Security Ruling 96-5p states, "[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.

[8] The Commissioner found Keel disabled as of July 27, 2004 in a supplemental action, and although evidence after that date may be relevant to the period ending July 27, 2004.  Docket No. 24.  The Appeals Council does not state the weight it gave to Dr. Mamone's opinion as expressed in the new evidence Keel submitted to it after the ALJ's decision.  Dr. Mamone, on August 20, 2004, opined that as a result of Keel's "failed back syndrome," Coronary Artery Disease, hypertension, Type 2 Diabetes Mellitus, sleep apnea, and depression, Keel cannot sit or stand for short periods of time, and is "unable to bend forward in any repetitive situation."  R. 263-64.

-40-

treatment (including several surgical procedures) for her ailments.  The Court therefore remands on this issue to allow the Commissioner to reevaluate the evidence and to explain the basis for her decision, including the various weights assigned the medical opinions in the record.

### 2.    The Severity of Keel's Mental Impairments

Keel also argues that the ALJ erred in finding that Keel has no functional limitations as a result of her mental impairments.  Docket No. 19 at 13.  The Commissioner responds that substantial evidence supports the Commissioner's finding that Keel's mental impairments were not severe.  Docket No. 20 at 3.  Keel specifically complains that the ALJ disregarded the state agency psychologist's opinion (dated November 13, 2002).  Docket No. 19 at 14. Keel is correct in arguing that the ALJ "failed to set forth any reasons whatsoever for his obvious rejection of [the psychologist's] opinion.  *Id.*

Again, the ALJ failed to state with particularity the weight he gave to *any* of the medical opinions on Keel's mental condition.  The ALJ made a specific finding that Keel had mild or no restrictions in the four broad functional areas,[9] but never explains why the ALJ rejected the state agency psychologist's conclusion that Keel's Affective Disorder was

---

[9]According to the Code of Federal Regulations, the four broad functional areas (in evaluating mental impairments) are: 1.) activities of daily living, 2.) social functioning, 3.) concentration, persistence or pace, and 4.) episodes of decompensation.  20 C.F.R. § 416.920a(c)(3).  The Code also provides, in pertinent part, that:

> If we [the Commissioner] rate the degree of [the claimant's] limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

20 C.F.R.  416.920a(d)(1).

"severe" enough to necessitate assessment of Keel's mental RFC.  R. 208.[10]  The ALJ, in fact,

never mention the psychologist's opinion in his decision.  This Court, again, finds that

remand is necessary as the failure to state with particularity the weight assigned to the

medical opinions in the record make it impossible to determine whether the ALJ's findings

were based on substantial evidence.

**VI.**      **CONCLUSION**

          This case is therefore **REMANDED** to the Commissioner pursuant to Sentence Four

to allow the Commissioner to reevaluate the evidence, to explain the basis for her decision,

and to hold such further proceedings as she may be advised.  The Clerk shall enter judgment

in favor of Plaintiff and close the case.

          **DONE AND ORDERED** this 17th day of March, 2006.


                                                        JAMES G. GLAZEBROOK
                                                        UNITED STATES MAGISTRATE JUDGE


The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel

---

[10]The psychologist also opined that Keel was moderately limited in her ability to maintain attention and concentration for extended periods of time, and moderately limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  R. 205.

-42-

Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Peter M. Davenport
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817